No. 24-60407

_____

# In the United States Court of Appeals for the Fifth Circuit

_____

theDove Media, Incorporated,

*Petitioner,*

v.

Federal Communications Commission; United States of America,

*Respondents.*

_____

*On Petition for Review of an Order
of the Federal Communications Commission*

_____

## PETITIONER'S OPENING BRIEF

_____

Wilson C. Freeman
Pacific Legal Foundation
3241 E. Shea Blvd., # 108
Phoenix, AZ 85028
Telephone: (716) 352-3541
WFreeman@pacificlegal.org

Oliver J. Dunford
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: (916) 503-9060
ODunford@pacificlegal.org

*Counsel for Petitioner*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Petitioner | Respondents |
|---|---|
| theDove Media, Inc. | Federal Communications Commission<br><br>United States of America |
| **Counsel for Petitioner** | **Counsel for Respondents** |
| Oliver J. Dunford and Wilson C. Freeman of Pacific Legal Foundation | P. Michele Ellison, Jacob M. Lewis, and William J. Scher, of Federal Communications Commission<br><br>Merrick Garland and Robert J. Wiggers, U.S. Department of Justice, for United States of America |

/s/ *Oliver J. Dunford*
OLIVER J. DUNFORD
*Counsel for Petitioner*

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rules of Appellate Procedure 34(a) and 34(f) and Fifth Circuit Rule 28.2.3, Petitioner respectfully requests oral argument because this case involves a complex history of agency action, and important issues of constitutional and statutory law.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................. i

Request for Oral Argument ....................................................... ii

Table of Contents ................................................................. iii

Table of Authorities ............................................................... v

Jurisdictional Statement ......................................................... xii

Statement of the Issues ......................................................... xiii

Introduction ....................................................................... 1

Statement of the Case ............................................................ 5

    A.   Statutory background ..................................................... 5

    B.   The FCC adopts equal employment opportunity regulations without congressional authorization ............... 6

    C.   The D.C. Circuit twice concludes that the Commission's EEO rules are unconstitutional ............................ 9

    D.   The FCC reimposes collection of Form 395-B data ........... 13

    E.   theDove files this petition for review ................................. 19

Summary of the Argument ..................................................... 23

Argument ......................................................................... 25

   I.   The Order is beyond the FCC's delegated power ........................ 25

    A.  The FCC lacks explicit congressional authority to impose Form 395-B ...................................................... 25

       1.  No "public interest" or other generalized language supports the publication and collection of Form 395-B ............................................. 26

       2.  The FCC's authority to conduct "inquiries" does not include the power to require industry-wide reporting and publication ....................................... 33

       3.  The FCC's reliance on Section 334 is misplaced ................................................... 34

    B.   The FCC's claim of virtually unlimited power to define, and act upon on its definition of, the "public interest"—beyond its charge to ensure widespread communication services—violates the nondelegation doctrine ............................................................... 36

II.  The 395-B Form requirement is unconstitutional ...................... 40

    A.   The requirement to file and publish Form 395-B violates equal protection ..................................... 40

          1. The requirement is subject to strict scrutiny because it compels broadcasters to classify individuals by race and post information online ..................................................... 42

          2. The Order would fail any level of scrutiny, and certainly fails strict scrutiny ................................... 50

    B.   The requirement to file and publish Form 395-B violates the First Amendment prohibition on compelled speech ............................................... 55

Conclusion ........................................................................... 61

Certificate of Service ........................................................... 62

Certificate of Compliance .................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)..................................................4

*Adarand Constructors, Inc. v. Peña*,
515 U.S. 200 (1995)................................................43

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
760 F.3d 18 (D.C. Cir. 2014)..................................59

*Am. Trucking Ass'ns, Inc. v. ICC*,
673 F.2d 82 (5th Cir. 1982)...................................22

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)..............................................25

*BST Holdings, LLC v. OSHA*,
17 F.4th 604 (5th Cir. 2021), *aff'd by Nat'l Fed'n*
*of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022)....................37

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989)..............................................44

*Clean Water Action v. EPA*,
936 F.3d 308 (5th Cir. 2019)...................................25

*Consumers' Research v. FCC*,
109 F.4th 743 (5th Cir. 2024) ..........................36–38

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast*
*Bldg. & Constr. Trades Council*,
485 U.S. 568 (1988)..............................................24

*FEC v. Cruz*,
596 U.S. 289 (2022)..............................................25

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)..............................................21

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
968 F.3d 454 (5th Cir. 2020)...................................27

*Gundy v. United States*,
588 U.S. 128 (2019).........................................36–38

*Johnson v. California,*
    543 U.S. 499 (2005) .................................................................. 42

*Leedom v. Kyne,*
    358 U.S. 184 (1958) .................................................................. 23

*Lewis v. Ascension Par. Sch. Bd.,*
    662 F.3d 343 (5th Cir. 2011) ............................................... 44–45

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................. 20

*Lutheran Church-Missouri Synod v. FCC,*
    141 F.3d 344 (D.C. Cir. 1998) .................................... *passim*

*MD/DC/DE Broadcasters Ass'n v. FCC,*
    236 F.3d 13 (D.C. Cir. 2001) ..................................... *passim*

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ............................................... 60

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
    595 U.S. 109 (2022) .................................................................. 37

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
    107 F.4th 415 (5th Cir. 2024) ............................................. 32

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
    585 U.S. 755 (2018) ....................................... 55–56, 59–60

*NRA v. Vullo,*
    602 U.S. 175 (2024) ........................................................... 3, 41

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) .......................................................... 44, 50

*PruneYard Shopping Ctr. v. Robins,*
    447 U.S. 74 (1980) .................................................................. 57

*R.J. Reynolds Tobacco Co. v. FDA,*
    696 F.3d 1205 (D.C. Cir. 2012) ......................................... 59

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988) ............................................................ 55–57

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
    547 U.S. 47 (2006) ............................................................. 56–57

*Russello v. United States,*
    464 U.S. 16 (1983) ........................................................... 32

*Shaw v. Reno,*
    509 U.S. 630 (1993) ......................................................... 43

*Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs,*
    531 U.S. 159 (2001) ......................................................... 24

*Stahlman v. FCC,*
    126 F.2d 124 (D.C. Cir. 1942) ...................................... 33

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) ............................................... *passim*

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ......................................................... 20

*Texas v. NRC,*
    78 F.4th 827 (5th Cir. 2023) ......................................... 22

*United States v. Heinszen & Co.,*
    206 U.S. 370 (1907) ......................................................... 36

*United States v. Texas,*
    599 U.S. 670 (2023) ......................................................... 20

*Wales Transp., Inc. v. ICC,*
    728 F.2d 774 (5th Cir. 1984) ........................................ 22

*Washington v. Davis,*
    426 U.S. 229 (1976) ......................................................... 43

*Whitman v. Am. Trucking Ass'ns, Inc.,*
    531 U.S. 457 (2001) ......................................................... 36

*Wooley v. Maynard,*
    430 U.S. 705 (1977) .................................................. 4, 40

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ......................................................... 25

*Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio,*
    471 U.S. 626 (1985) ................................................. 59–60

## Agency Proceedings

*Amendment of Part 73 of the Commission's Rules Concerning Equal Employment Opportunity in the Broadcast Radio and Television Services,*
2 FCC Rcd. 3967 (1987) (1987 Order) ...................................... 6, 9–10

*Nat'l Religious Broadcasters' Notice of Permitted Ex Parte Presentation,*
MM Docket No. 98-204 (Mar. 13, 2002) ............................................ 22

*Comments of Nat'l Religious Broacasters,*
MM Docket No. 98-204 (Apr. 15, 2002) ............................................ 22

*Equal Employment Opportunity Processing Guideline Modifications for Broadcast Renewal Applicants,*
79 F.C.C. 2d 922 (1980) .................................................................... 8–9

*Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking,*
FCC 24-18, 2024 WL 770889 (2024) (Order) ............................. *passim*

*Leadership Conference on Civil & Human Rights Comment,* MB Docket No. 98-204 (Sept. 29, 2022) ........................... 46

*MMTC Notice of Ex Parte Communications,*
MM Docket No. 98-204 (Mar. 3, 2022) ........................................ 46–47

*MMTC Notice of Ex Parte Communications,*
MM Docket No. 98-204 (Oct. 1, 2002) ............................................... 47

*Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices,*
23 F.C.C. 2d 430 (1970) (1970 Order) ............................................. 6–8

*Ex Parte Presentation,*
MM Docket No. 98-204 (Mar. 13, 2002) ............................................ 22

*Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules & Policies (Second Report and Order & Third NPRM)*
17 FCC Rcd. 24018 (2002) ................................................................. 14

*Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules & Policies* (Third Report and Order & Fourth NPRM) 19 FCC Rcd. 9973 (2004) .......................................... 14–15

*Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies and Termination of the EEO Streamlining Proceeding* (First Report and Order), 15 FCC Rcd. 2329 (2000) (2000 Order) ...................................... 11–12

*Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies* (Further NPRM) 36 FCC Rcd. 12055 (2021) .................................... 15

*Suspension of the Broadcast and Cable Equal Employment Opportunity Outreach Program Requirements,* 16 FCC Rcd. 2872 (2001) .................................... 13

*Suspension of Requirement for Filing of Broadcast Station Annual Employment Reports and Program Reports,* 13 FCC Rcd. 21998 (1998) .................................. 11

## United States Constitution

U.S. CONST. art. I, § 1 ........................................................... 36

U.S. CONST. amend. I ............................................ 23–24, 55, 57, 59–60

U.S. CONST. amend. XIV ....................................................... 43

## Statutes

28 U.S.C. § 2112 ................................................................ 20

28 U.S.C. § 2344 ................................................................ 22

42 U.S.C. § 2000e-8(e) ......................................................... 51

47 U.S.C. § 151 ........................................................ 4–5, 26–27, 39

47 U.S.C. § 154(i) ........................................................ 6, 26–27, 29

47 U.S.C. § 154(k) ......................................................... 26, 28

47 U.S.C. § 155 ........................................................... 26, 28

47 U.S.C. § 301 ........................................................... 26, 28

47 U.S.C. § 303 ........................................................ 6, 26, 28–29

47 U.S.C. § 303(a) .................................................................. 29

47 U.S.C. § 303(b) .................................................................. 29

47 U.S.C. § 303(d) .................................................................. 29

47 U.S.C. § 303(j) ................................................................... 29

47 U.S.C. § 303(o) .................................................................. 29

47 U.S.C. § 303(r) ................................................................... 29

47 U.S.C. § 303(y) .................................................................. 29

47 U.S.C. § 307 ............................................................ 6, 26, 29

47 U.S.C. § 308 ............................................................ 6, 26, 30

47 U.S.C. § 309 ............................................................ 6, 26, 30

47 U.S.C. § 309(a) .................................................................... 5

47 U.S.C. § 310 ............................................................ 6, 26, 30

47 U.S.C. § 310(d) .................................................................. 30

47 U.S.C. § 334 ................................................................ *passim*

47 U.S.C. § 334(c) .................................................................. 34

47 U.S.C. § 336 ................................................................ 26, 31

47 U.S.C. § 336(a)(2) ............................................................. 31

47 U.S.C. § 339 ................................................................ 26, 31

47 U.S.C. § 403 ............................................................ 26, 31, 33

47 U.S.C. § 554(d) .................................................................. 32

47 U.S.C. § 554(d)(3)(A) ........................................................... 9

Pub. L. No. 73-416 .................................................................... 5

Pub. L. No. 104-104, 110 Stat. 86 (Feb. 8, 1996) ........................... 5

## Regulations

47 C.F.R. § 1.526 (1970) ............................................................ 8

47 C.F.R. § 73.2080 (1992) ......................................................... 9

47 C.F.R. § 73.2080 (2002) ....................................................... 14

62 Fed. Reg. 58782 (Oct. 30, 1997)..................................................14–15

68 Fed. Reg. 34965-6 (June 11, 2023) ....................................................15

89 Fed. Reg. 36705 (May 3, 2024) ..........................................................20

## Other Authorities

Bernstein, David E., *The Modern American Law
of Race*, 94 S. Cal. L. Rev. 171 (2021)................................................58

Scalia, Antonin & Garner, Bryan A.,
*Reading Law* (2012) ...........................................................................31

# JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 2342 to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" any final order of the Federal Communications Commission made reviewable under 47 U.S.C. § 402(a). The order at issue here is reviewable under § 402(a) because it is not among the decisions or orders listed in § 402(b), which are reviewed by the U.S. Court of Appeals for the District of Columbia Circuit. The FCC entered its final order in the Federal Register on May 3, 2024. *Review of the Commission's Broadcast & Cable Equal Employment Opportunity Rules and Policies*, 89 Fed. Reg. 36705, JA__. Petitioner theDove Media, Inc., timely petitioned for review in the Ninth Circuit, where its principal place of business is located. *See* Ex. 1 ¶2 (Atkinson Decl.); Petition for Review, *theDove Media, Inc. v. FCC*, Case No. 24-4010 (9th Cir. 2024), ECF No. 1; 28 U.S.C. §§ 2343–2344; 47 U.S.C. § 402(a); 47 C.F.R. §§ 1.4, 1.103. Pursuant to 28 U.S.C. § 2112, theDove Media's case was transferred to the Fifth Circuit, as it relates to consolidated challenges to the same Order. *National Religious Broadcasters v. FCC*, Case Nos. 24-60219 and 24-60226 (5th Cir. 2024). Venue is therefore proper in this Court.

# STATEMENT OF THE ISSUES

1.     Does the Order exceed the FCC's authority under the Communications Act of 1934, as amended? If not, does the Communications Act of 1934, as amended, violate the nondelegation doctrine? Alternatively, does the Communications Act of 1934, as amended, violate the nondelegation doctrine at least with respect to television broadcasters?

2.     Does the Order violate the Constitution's guarantee of equal protection?

3.     Does the Order violate the First Amendment right to free speech?

# INTRODUCTION

Congress created the Federal Communications Commission in 1934 to ensure, as much as possible, widely available communication services. Roughly 35 years later, without congressional authorization, the FCC decided that it should police workplace demographics. Among other things, the FCC has required broadcasters to (1) adopt affirmative equal opportunity programs based on race, ethnicity, and sex; and (2) identify and report, via FCC "Form 395-B," each employee's race(s), ethnicity(ies), and sex, so that the FCC could enforce its EEO edicts. The D.C. Circuit twice held that the FCC's racial diversity/balancing mandates violated the Constitution's guarantee of equal protection—in large part because of the "pressure" created by the FCC's reporting requirement. *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 19 (D.C. Cir. 2001); *see also Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998). In response, and recognizing the obvious unconstitutionality of its previous approach, the FCC suspended the Form 395-B requirement.

But now, twenty years later, the FCC has decided to repeat its mistake and resurrect its diversity scorecard. Broadcasters are once again mandated to classify each employee's race(s), ethnicity(ies), and sex (now,

including a non-binary category), and then submit annual Form 395-B reports for non-anonymous public disclosure on the FCC's website. *See Fourth Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking*, FCC 24-18, 2024 WL 770889 (rel. Feb. 22, 2024) (Order), JA__.

The Commission, which has "life and death" licensing authority over broadcasters, *MD/DC/DE Broadcasters*, 236 F.3d at 19, claims that it will use the Form 395-B data only to analyze workforce trends in the broadcast industry, Order ¶15, JA__. If that were so, there would be no need to publicize each station's diversity scorecard without anonymizing the data. Worse, the Order itself reveals that merely analyzing trends is not the FCC's only—or even, its main—goal. The Order repeatedly justifies the collection and publication of workplace demographics so that the FCC can promote the "critical" goal of "workforce diversity" by measuring its "progress." *See, e.g.*, *id.* ¶¶2, 14, 52, JA__.

Thus, as Commissioner Carr observed in his dissenting statement, "[t]he record makes clear that the FCC is choosing to publish these score-card[s] for one and only one reason: to ensure that individual businesses are targeted and pressured into making decisions based on race and

gender." Order at 52, JA__ (Carr, Comm'r, dissenting). The Commission itself acknowledges that this kind of pressure violates the Constitution's guarantee of equal protection of the law. Order ¶8, JA__. It claims to resolve this constitutional defect by promising to dismiss any third-party EEO complaint based on 395-B data that is *submitted to the Commission. See, e.g., id.* ¶¶17 & 45, JA__. But the Commission, of course, cannot dismiss complaints filed in court or in other agencies.

Therefore, the Commission's assurance that it will not *directly* pressure broadcasters to engage in unconstitutional hiring practices does not constitutionalize the Order. *See NRA v. Vullo*, 602 U.S. 175, 190 (2024) (The government "cannot do indirectly what [it] is barred from doing directly."); *see also MD/DC/DE Broadcasters*, 236 F.3d at 19 (noting that the FCC "in particular has a long history of employing a variety of *sub silentio* pressures") (cleaned up).

This equal protection defect is just one of the Order's fatal flaws. As alluded to above, the Commission lacks statutory authority from Congress to impose the Form 395-B requirement in the first place. Instead, the Commission points to its authorization under the Communications Act of 1934 to act for the public interest. *See, e.g.,* Order ¶14, JA__. But

this authorization cannot be understood as a limitless grant of policy-making power. Rather, the Commission may take action—but only when it does so for the public's interest in a "rapid, efficient, Nation-wide, and world-wide wire and radio communication service . . . ." 47 U.S.C. § 151. If, on the other hand, the law allows the Commission itself to define a public interest unrelated to communication services, the law violates the nondelegation doctrine.

Third, and finally, the Order is unconstitutional because it compels speech from broadcasters. It forces them to conduct annual surveys of their workforce and guess at each employee's race and gender. It then forces them to post those guesses for the world to see. This violates the fundamental principle that the government cannot compel individuals or entities to convey messages or disclose information against their will. *See 303 Creative LLC v. Elenis*, 600 U.S. 570 (2023); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

theDove Media, petitioner here, is a small religious broadcasting company that owns several television and radio stations with relatively few employees. *See* Ex. 1 ¶4 (Atkinson Decl.). It broadcasts Christian content, and simply wants to continue its business without getting into

fights over racial classifications or proportionality. *Id*. ¶7. It has been a generation since this form was required and now, despite the Supreme Court's repeated pronouncements on the unconstitutionality of government-mandated diversity, it is back.

This Court should set aside and enjoin the Order.

## STATEMENT OF THE CASE

### A. Statutory background

Congress established the FCC through the Communications Act of 1934 for "the purpose of regulating interstate and foreign commerce in communication by wire and radio" to make available a "rapid, efficient, Nation-wide, and world-wide wire and radio communication service," "so far as possible, to all the people of the United States." 47 U.S.C. § 151 (1934) (Pub. L. No. 73-416).[1] Critically, the Commission may grant and renew (or not) applications for broadcasting licenses based on whether, in its determination, "the public interest, convenience, and necessity will be served by the granting of such application[s]." 47 U.S.C. § 309(a); *see*

---

[1] In 1996, Congress amended § 151 to add, after "United States," the following language: "without discrimination on the basis of race, color, religion, national origin, or sex." *See* Pub. L. No. 104-104, Title I, § 104, Feb. 8, 1996, 110 Stat. 86). The FCC does not rely on this added language to justify its reimposition of Form 395-B.

*MD/DC/DE Broadcasters*, 236 F.3d at 19 (describing FCC's authority here as "life and death power over" licensees).

### B. The FCC adopts equal employment opportunity regulations without congressional authorization

The Communications Act of 1934 did not grant the FCC authority over workplace employment. Nonetheless, relying on its supposedly unmoored "public interest, convenience, and necessity" power, the FCC in 1969 and 1970 adopted EEO regulations and required broadcasters (with five or more employees) to file an annual report of each broadcaster's workforce demographics. *See Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices*, 23 F.C.C. 2d 430, 430 ¶¶1-2, 435 ¶10 (1970) (1970 Order) (citing 47 U.S.C. §§ 154(i), 303, 307–310); *see also* Order ¶5, JA__. This reporting requirement was linked to the Commission's EEO rules and modeled on the EEOC's EEO-1 reporting requirement. 1970 Order at 432 ¶5. *See also Amendment of Part 73 of the Commission's Rules Concerning Equal Employment Opportunity in the Broadcast Radio and Television Services*, 2 FCC Rcd. 3967, 3967–68 (1987) (1987 Order) (aligning FCC reporting with EEO-1 format).

Contrary to the FCC's current claims that Form 395-B seeks "purely factual and uncontroversial information," *see* Order ¶52, JA__, the FCC has repeatedly and arbitrarily identified, defined, and redefined racial categories. Initially, the FCC "requir[ed] development of equal employment opportunity programs [for] Negroes, American Indians, Spanish-surnamed Americans, and orientals." 1970 Order at 431 ¶3; *see also id.* at 438, Appendix B (identifying four categories within "Minority Group Employees": "Negroes, American Indians, Orientals, and Spanish-surnamed Americans"). But the FCC decided that the "term 'American Indian' d[id] not include Eskimos and Aleuts." *Id.* at 438. The FCC also "deemed" the term "Spanish-surnamed Americans" "to include all persons of Mexican, Puerto Rican, Cuban, or Spanish origin," and added that "[i]dentification" of "Spanish-surnamed Americans" could be made "by inspection of records bearing the employees' names, by visual survey, by employees' use of the Spanish language, or other indications that they belong to this group." *Id.* As discussed below, the FCC continues to reconsider and redefine racial/ethnic categories—a fraught enterprise.

According to the FCC, the purpose of this data collection was to assess broadcasters' compliance with the FCC's EEO rules and encourage

"proportional" representation across the industry by comparing station staff demographics with those of the surrounding labor market. 1970 Order at 430, ¶4. The FCC required broadcasters to maintain copies of their Form 395-B reports at local studios and permit the public to review them upon request. *Id.* at 436 (amending 47 C.F.R. § 1.526 (1970)). Although the FCC disclaimed it was requiring quotas or "fully proportional" workforces, it made clear from the beginning that workforce proportionality was the goal, which is especially significant in light of the Commission's life-and-death power over licensees and its broad ambit to take action. *See* 1970 Order ¶4 (explaining that the data "is useful to show industry employment patterns and to raise appropriate questions as to the causes of such patterns" and that, *e.g.*, "if none of the broadcast stations in a city with a large Negro population had any Negro employees in other than menial jobs, a fair question would be raised as to the cause of this situation"). Over time, racial "parity" became an explicit part of the FCC's licensing process, and the FCC began conditioning licensing on express racial thresholds or quotas. *See Equal Employment Opportunity Processing Guideline Modifications for Broadcast Renewal Applicants*, 79 F.C.C. 2d

922, ¶¶20–26 (1980) (describing racial parity requirement as component of licensing process); 1987 Order at 3974.

Congress has addressed the Commission's EEO authority only twice. In the Cable Communications Policy Act of 1984, Congress enacted a specifically subtitled EEO provision requiring cable providers (with five or more full-time employees) to file reports almost identical to those required by Form 395-B. 47 U.S.C. § 554(d)(3)(A). Next, in the 1992 Cable Television Consumer Protection and Competition Act, Congress directed the FCC "not [to] revise . . . the regulations concerning equal employment opportunity as in effect on September 1, 1992 (47 C.F.R. § 73.2080) as such regulations apply to television broadcast station licensees and permittees." 47 U.S.C. § 334.

## C. The D.C. Circuit twice concludes that the Commission's EEO rules are unconstitutional

The Commission's "life and death power" over licensees was highlighted by two opinions from the D.C. Circuit. First, in *Lutheran Church*, a church seeking to renew two broadcasting licenses faced questions from FCC staff about the licensees' affirmative action efforts. 141 F.3d at 346. Soon after, the NAACP filed a petition to deny the applications on the ground that the church had hired too few African Americans and that the

church's hiring of a Hispanic employee was irrelevant since there were so few Hispanics in the labor market. *Id.* at 346 & n.1. At this time, the FCC defined "minority" as "Blacks not of Hispanic origin, Asians or Pacific Islanders, American Indians or Alaskan Natives and Hispanics." *Id.* at 346 n.1 (quoting 1987 Order at 3979).

The FCC found that the Church had made insufficient efforts to recruit minorities, imposed reporting requirements on its EEO efforts, and ordered a $25,000 fine. *Id.* at 347. The Church petitioned for review to the D.C. Circuit and argued that the affirmative action portion of the FCC's EEO rules violated the Fifth Amendment's equal protection guarantee. *Id.* at 349.

The court first concluded that the FCC's EEO rules must pass strict scrutiny, focusing on whether the FCC's rules "oblige[d] stations to grant some degree of preference to minorities in hiring." *Id.* at 351. Because the "entire scheme" was based on "the notion that stations should aspire to . . . proportional representation," it had to meet strict scrutiny. *Id.* at 352–53. The court noted that the FCC's regulations, through Form 395-B, relied heavily on statistics, creating risks "not only in attracting the Commission's attention but also that of third parties." *Id.* at 390.

Applying strict scrutiny, the D.C. Circuit determined that the EEO rules were neither supported by a compelling interest nor narrowly tailored. *Id.* at 355–56.

After this decision, the FCC suspended Form 395-B while it considered the court's ruling and revised its EEO rules. *Suspension of Requirement for Filing of Broadcast Station Annual Employment Reports and Program Reports*, 13 FCC Rcd. 21998 (1998). The new policy, released in 2000, emphasized outreach rather than racial hiring targets. *See* Order ¶7, JA__. The revised Form 395-B was reinstated but, the FCC promised, the resulting data would be used only to "monitor employment trends and report to Congress." *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies and Termination of the EEO Streamlining Proceeding* (First Report and Order), 15 FCC Rcd. 2329, 2332 (2000) (2000 Order); *see also* Order ¶7, JA__. Here, the FCC again changed its definitions of racial categories:

    a. White, not of Hispanic Origin – A person having origins in any of the original peoples of Europe, North Africa, or the Middle East.

    b. Black, not of Hispanic Origin – A person having origins in any of the black racial groups of Africa.

c. Hispanic – A person of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish Culture or origin, regardless of race.

d. Asian or Pacific Islander – A person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands. This area includes, for example, China, Japan, Korea, the Philippine Islands, and Samoa.

e. American Indian or Alaskan Native – A person having origins in any of the original peoples of North America, and who maintains cultural identification through tribal affiliation or community recognition.

*See* 2000 Form 395-B, p. 4;[2] 2000 Order at 2502. According to the 2000 Form 395-B, "[m]inority group information necessary for this section may be obtained either by visual surveys of the work force, or from post employment records as to the identity of employees. An employee may be included in the minority group to which she or he appears to belong, or is regarded in the community as belonging." 2000 Form 395-B, p. 5.

This new regime, including the requirement to collect and submit workplace employment data, was immediately struck down on equal protection grounds. *MD/DC/DE Broadcasters*, 236 F.3d at 15. As the court explained, broadcasters had been given two EEO options: (1) undertake certain initiatives designed by the FCC or (2) design their own outreach

---

[2] *See* https://transition.fcc.gov/Forms/Form395B/395b.pdf.

programs. *Id.* at 17. The court focused on the second option, which imposed upon broadcasters the additional obligation to report the race, sex, and source of referral for each applicant. *Id.* at 19. The court thus dismissed the FCC's claim that its new rule was innocently focused on outreach, explaining that the reporting requirement clearly pressured broadcasters to recruit and hire minority and women applicants. *Id.* at 19–20. For an agency "with life and death power over the licensee" and a history of unofficial *sub silentio* pressure, the court observed, licensees would understand and respond to the Commission's interest in *results*. *Id.* Concluding that the FCC's rule was not narrowly tailored to any compelling interest, the D.C. Circuit sent the Commission back to the drawing board. *Id.* at 23.

Following this decision, the FCC again suspended the collection of EEO data while it developed another version of its EEO rule. *Suspension of the Broadcast and Cable Equal Employment Opportunity Outreach Program Requirements*, 16 FCC Rcd. 2872 (2001).

**D. The FCC reimposes collection of Form 395-B data**

The FCC's further revised EEO rule took effect in 2002, purportedly addressing the issues identified in *MD/DC/DE Broadcasters* by (again)

requiring race-neutral outreach. *See* Order ¶10, JA__; 47 C.F.R. § 73.2080 (2002). However, the FCC declined to reinstate the collection of Form 395-B data because of concerns about disclosure and data anonymization, and because the FCC wanted to incorporate new OMB standards for classifying race and ethnicity. Order ¶10; *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules & Policies* (Second Report and Order & Third NPRM)*,* 17 FCC Rcd. 24018, 24024–25 n.36 (2002).

In 2004, the FCC again considered reimposing the racial-scorecard requirement. It stated that it was required to follow "OMB standards for classifying data on race and ethnicity." *See Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules & Policies* (Third Report and Order & Fourth NPRM), 19 FCC Rcd. 9973, 9977 (2004), JA__ (citing Race and Ethnic Standards for Federal Statistics and Administrative Reporting, OMB Statistical Policy Directive No. 15; Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58782 (Oct. 30, 1997)). According to OMB, the revised standards were to "have five minimum categories for data on race: American Indian or Alaska Native, Asian, Black or African Ameri-

can, Native Hawaiian or Other Pacific Islander, and White. There will be two categories for data on ethnicity: 'Hispanic or Latino' and 'Not Hispanic or Latino.'" 62 Fed. Reg. at 58782.

The FCC noted that the EEOC was in the process of revising its EEO-1 form to conform to OMB's requirements. 19 FCC Rcd. at 9978, JA__ (citing 68 Fed. Reg. 34965-6 (June 11, 2003)). Because the EEOC's revisions were not final, the FCC stated it would continue to follow the then-current version of EEO-1. *Id.*

Ultimately, the FCC decided to allow "a one-time filing grace period until a date is determined." 19 FCC Rcd. at 9978, JA__. This remained the landscape for almost 20 years.

In 2021, claiming a need to "refresh the 2004 record with regard to Form 395-B," Order ¶12, JA__, the FCC announced its intention to resurrect the defunct Form 395-B requirement, *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies* (Further NPRM), 36 FCC Rcd. 12055 (2021), JA__. Despite numerous objections, the FCC released the Order in February 2024, reinstating the requirement for licensees to file Form 395-B. Order ¶52, JA__. The reinstated version of Form 395-B is based on the revised EEO-1 form, noted

above. *Id.* ¶14 n.57, JA__. And again the racial categories have been changed. Now, Form 395-B includes the following definitions of "race and ethnicity categories":

> **Hispanic or Latino** – A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.
>
> **White (Not Hispanic or Latino)** – A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.
>
> **Black or African American (Not Hispanic or Latino)** – A person having origins in any of the black racial groups of Africa.
>
> **Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino)** – A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.
>
> **Asian (Not Hispanic or Latino)** – A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.
>
> **American Indian or Alaska Native (Not Hispanic or Latino)** – A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment.
>
> **Two or More Races (Not Hispanic or Latino)** – All persons who identify with more than one of the above five races.
>
> **Instructions for assigning employees into the race/ethnic categories:**

**Hispanic or Latino** – Include all employees who answer YES to the question, "Are you Hispanic or Latino". Report all Hispanic males in Column A and Hispanic females in Column B.

**White (Not Hispanic or Latino)** – Include all employees who identify as White males in Column C and as White females in Column I.

**Black or African American (Not Hispanic or Latino)** – Include all employees who identify as Black males in Column D and as Black females in Column J.

**Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino)** – Include all employees who identify as Native Hawaiian or Other Pacific Islander males in Column E and as Native Hawaiian or Other Pacific Islander females in Column K.

**Asian (Not Hispanic or Latino)** – Include all employees who identify as Asian males in Column F and as Asian females in Column L.

**American Indian or Alaska Native (Not Hispanic or Latino)** – Include all employees who identify as American Indian or Alaska Native males in Column G and as American Indian or Alaska Native females in Column M.

**Two or More Races (Not Hispanic or Latino)** – Report all male employees who identify with more than one of the above five races in Column H and all female employees who identify with more than one of the above five races in Column N.[3]

---

[3] *See* https://tinyurl.com/bdhwv87z ("7. Race and Ethnic Identification"); *see* Order ¶14 n.57, JA__.

As with previous aborted attempts to reinstate the form, the FCC disclaimed any intent to use the collected data as part of licensing or enforcement actions and insisted the data would be used only for "compiling industry employment trends and making reports to Congress." Order ¶52, JA__. Despite this assurance, the FCC refused numerous requests to anonymize the data and introduced a new requirement of public disclosure of each broadcaster's Form 395-B responses on the FCC's website. *Id.*, ¶14 JA__. The FCC also amended the Form by adding a new nonbinary gender category. *Id.* Commentators raised concerns that these requirements will inevitably lead to third-party pressure campaigns, especially with widespread online disclosure (which obviously did not exist for previous versions of Form 395-B) and potential *sub silentio* scrutiny by the Commission. But the FCC dismissed these concerns as "speculative" without further explanation. *Id.* ¶17, JA__. Instead, the FCC itself speculated that public disclosure would allow third parties to check the accuracy of broadcaster filings. *Id.* ¶¶17 & 35, JA__. Regardless, the FCC claimed, attempts by non-governmental third parties to pressure broadcasters in non-governmental forums would not "implicate any constitutional rights" of the broadcasters. *Id.* ¶17, JA__.

Two commissioners, Carr and Simington, dissented in part, criticizing the Commission's decision to require public disclosure of broadcasters' workplace demographics. They observed that the disclosure requirement was designed to put pressure on stations by "activist groups, media campaigns, and conceivably the government itself—unless . . . broadcasters hire the right (if unspecified) mix and type of employees." Order at 54–55, JA__ (Carr, Comm'r, dissenting).

**E.   theDove files this petition for review**

theDove Media is a relatively small religious broadcaster, with just over thirty radio and TV outlets. *About Us*, theDove Media, https://thedove.us/about-us/. Founded in 1983, and growing consistently ever since, theDove now reaches over six million consumers daily, through radio and television broadcasting, along with cable and multiple streaming services. *Id.* In 2012, theDove was named the Television Station of the Year (Low Power) by the National Religious Broadcasters. *NRB Media Award Recipients*, National Religious Broadcasters, https://nrb.org/membership/awards/nrb-media-award-recipients/.

The Order, which reinstated the FCC's race-reporting requirement, was released on February 22, 2024, and published in the Federal Register

on May 3, 2024. Order, JA__; 89 Fed. Reg. 36705, JA__. Petitioner the-Dove Media—which owns the licenses of AM, FM, and TV broadcast stations with five or more full-time employees, and is therefore subject to the Order, *see* Ex. 1 ¶4 (Atkinson Decl.)—timely filed suit in the 9th Circuit. Petition for Review, *theDove Media, Inc. v. FCC*, Case No. 24-4010 (9th Cir. 2024), ECF No. 1. Pursuant to 28 U.S.C. § 2112, theDove Media's case was transferred to the Fifth Circuit, as it relates to consolidated challenges to the same Order. *National Religious Broadcasters v. FCC*, Case Nos. 24-60219 and 24-60226 (5th Cir. 2004).

theDove Media has constitutional standing to challenge the Order. The Supreme Court has long established that when "the plaintiff is [itself] an object of the action (or forgone action) at issue . . . there is ordinarily little question that the action or inaction has caused [it] injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). *See also Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("Here, respondents can demonstrate standing only if application of the regulations by the Government will affect *them* . . . ."); *United States v. Texas*, 599 U.S. 670, 676, (2023) ("To establish standing, a plaintiff must show an injury in fact

caused by the defendant and redressable by a court order."). The Order is such an action causing such an injury. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish."); *Lutheran Church*, 141 F.3d at 350 (observing that one may be injured merely by the government's "encourag[ing]" discrimination).

Even aside from potential reputational effects created by the public disclosure of the race and ethnicity employment data in Form 395-B, the collection of such data is costly. Especially for smaller broadcasters like theDove, where time and manpower are at a premium, the collection of the racial data and the transposition of such data into Form 395-B will take time, effort, and resources, all of which are necessarily zero sum. *See* Ex. 1 ¶6 (Atkinson Decl.) The use of such time for federal regulatory compliance necessarily means that other theDove efforts will suffer. *Lutheran Church*, 141 F.3d at 349–50 (observing that detailed reporting requirements give rise to injury). Only judicial action would serve to prevent such an injury.

theDove also has statutory standing under the Hobbs Act because it and its licensees are "part[ies] aggrieved" by the Order. 28 U.S.C. § 2344. theDove Media is a member of National Religious Broadcasters and the Oregon Association of Broadcasters, both of which participated in the agency proceeding through comments.[4] *See* Ex. 1 ¶5 (Atkinson Decl.).

In addition, because the FCC's Order exceeds its statutory authority, theDove Media has standing under the well-established "*ultra vires* exception to the party-aggrieved status requirement." *Texas v. NRC*, 78 F.4th 827, 839 (5th Cir. 2023). This Court recognizes that when "the agency action is 'attacked as exceeding [its] power'" and/or where the challenger opposes "the constitutionality of the statute conferring authority on the agency," participation in the underlying administrative proceeding is not necessary. *Id.* (citing *Am. Trucking Ass'ns, Inc. v. ICC*, 673 F.2d 82, 85 n.4 (5th Cir. 1982)); *see also Wales Transp., Inc. v. ICC*, 728 F.2d 774, 776 (5th Cir. 1984).

---

[4] *Comments of Nat'l Religious Broadcasters*, MM Docket No. 98-204 (Apr. 15, 2002), https://tinyurl.com/3b9r3naa; *Nat'l Religious Broadcasters' Notice of Permitted Ex Parte Presentation*, MM Docket No. 98-204 (Mar. 13, 2002), https://tinyurl.com/ypbnht22.

Finally, theDove has standing under *Leedom v. Kyne*. In that case, the Court established that jurisdiction exists "to strike down an order . . . made in excess of its delegated powers," and that "[i]f the absence of jurisdiction of the federal courts meant a sacrifice or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control." 358 U.S. 184, 188, 190 (1958). Rulemaking such as the Order is done in just that manner—in excess of the agency's delegated powers.

## SUMMARY OF THE ARGUMENT

This Court should enjoin and set aside the FCC's Order for three reasons. First, the Order is beyond the agency's power. The Commission cannot identify any statutory authority for its action, and this alone is reason to set it aside. If otherwise, the nondelegation doctrine bars the sweeping authority claimed by the Commission here. Second, the Order, as promulgated, is unconstitutional under equal protection principles. The agency cannot directly compel employers to classify their employees by race and cannot use indirect methods to accomplish that which the D.C. Circuit struck down. Third, the Order violates the First Amend-

ment's prohibition on compelled speech. Form 395-B would require broadcasters to make judgments about each employee's race(s), ethnicity(ies), and sex (and/or gender identity(ies)), and then submit those classifications to the FCC for public disclosure.

These significant constitutional questions have led directly to the FCC's decision not to reinstate Form 395-B for over 20 years. Over that time, the Supreme Court has only reinforced the principle that government must be color-blind. And when the constitutional issues raised by a rule are this problematic, a court should construe the statute to avoid these issues. *See Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001) (explaining that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress") (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).

Ultimately, this Court may invalidate the Order on statutory or constitutional grounds, or under the canon of constitutional avoidance.

# ARGUMENT

## I. The Order is beyond the FCC's delegated power

### A. The FCC lacks explicit congressional authority to impose Form 395-B

An "administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (The executive branch's authority "must stem either from an act of Congress or from the Constitution itself."). Agencies are "mere creatures of statute" and they "must point to explicit Congressional authority justifying their decisions." *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019); *see also FEC v. Cruz*, 596 U.S. 289, 301 (2022) ("An agency literally has no power to act unless and until Congress authorizes it to do so by statute.") (cleaned up).

The Commission makes essentially three claims for the authority to require this form. First, like it did with previous iterations of Form 395-B, the Commission asserts that the form can be required under the agency's "public interest authority" sprinkled throughout the Communications Act of 1934 (as amended). *See* Order ¶5 n.16, ¶13 n.53, ¶53 n.173,

& Appendix B, JA__ (citing 47 U.S.C. §§ 151, 154(i) & (k), 155, 301, 303, 307–310, 336, 339). Second, it claims this authority can be traced to the FCC's authority to institute "inquiries" by its own motion. *See id.* ¶53 n.176 (citing 47 U.S.C. § 403). Finally, the FCC asserts that its authority to require these disclosures was "ratified" by the 1992 Cable Act's direction that the FCC not revise its EEO regulations as they apply to television broadcasters. *Id.* ¶2 (citing 47 U.S.C. § 334).

However, as explained next, none of these provisions remotely authorizes the actual regulation the FCC has promulgated. Combine that with the numerous constitutional questions raised by Form 395-B—which have directly led to the agency's avoiding reinstating it for over 20 years—and it is clear the FCC has no authority to institute this requirement.

1. **No "public interest" or other generalized language supports the publication and collection of Form 395-B**

The FCC claims authority to impose the Form 395-B requirement under a general "public interest" authority, as it has done since it first invented the requirement in 1970. *See, e.g.*, Order ¶¶30–40, JA__ (defending proposal to make broadcasters' Forms 395-B available to the

public); ¶¶53–56, JA__ (asserting broad authority to collect Form 395-B). But these statutes authorize the Commission to carry out the purpose of the Communications Act of 1934 (as amended), to wit, ensuring efficient and widespread communications services:

- **47 U.S.C. § 151** states the FCC's purpose to regulate interstate and foreign commerce to make rapid and efficient wire and radio communication available "to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." This broad statement of purpose, which plainly refers to the recipients of communication services, self-evidently does not grant the FCC any power to require the publication of demographic surveys of every licensee's workforce. Nor does the Constitution permit the FCC to tie broadcast content or viewpoint to race. *See Lutheran Church*, 141 F.3d at 354–55.

- **47 U.S.C. § 154(i)** is merely a general provision giving the agency authority to enact rules and regulations as "may be necessary in the execution of its functions." This sort of delegation cannot be understood to enlarge other provisions of the Act. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir.

2020) ("The grant of authority to promulgate 'necessary' regulations cannot expand the scope of the provisions the agency is tasked with 'carry[ing] out.'").

- **47 U.S.C. § 154(k)** provides only that FCC investigation reports "shall be entered of record, and a copy thereof shall be furnished to the party who may have complained, and to any common carrier or licensee that may have been complained of."

- **47 U.S.C. § 155** outlines the duty of the FCC chair, who is the Commission's CEO; allows the FCC to delegate its functions (with certain exceptions); requires at least monthly Commissioner meetings; and establishes a Managing Director responsible for administrative and executive functions.

- **47 U.S.C. § 301** precludes anyone from transmitting energy, communications, or radio signals except in accordance with Title 47 U.S. Code, Chapter 5, and with a license granted thereunder.

- **47 U.S.C. § 303** identifies the "powers and duties" of the FCC in connection with radio communications. It provides, "[e]xcept as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall," *e.g.*,

"[c]lassify radio stations"; "[p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within any class"; "[d]etermine the location of classes of stations or individual stations"; "[h]ave authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals"; "[h]ave authority to designate call letters"; and "[h]ave authority to allocate electromagnetic spectrum;" etc. *Id.* § 303(a), (b), (d), (j), (o), (y). **Section 303(r)** gives the agency authority to make rules and regulations "not inconsistent with law, as may be necessary to carry out the provisions of this chapter." But as with § 154(i), this reference to necessary power cannot expand the agency's authority.

- **47 U.S.C. § 307** provides that, subject to certain limitations, "if public convenience, interest or necessity will be served thereby," the FCC "shall grant to any applicant therefor a station license provided for by this chapter." Section 307 requires the FCC to establish the terms of licenses (length, renewals) and make certain exemptions. Section 307 requires the FCC to consider the "equitable" distribution of radio *service*—but it does not allow the FCC to mandate

racial balancing among employees or public disclosure of workforce demographics.

- **47 U.S.C. § 309** requires the Commission to determine, for each license application (under **§ 308**), whether the "public interest, convenience, and necessity will be served" by the granting of the application. If so, the FCC "shall" grant the application. This section establishes timelines for granting applications; allows interested parties to file a petition with the FCC to deny the application and provides for hearings on such petitions when appropriate; establishes ground rules for various contingencies (*e.g.*, the FCC may randomly select among applicants for the same license or employ competitive bidding); and discusses use of the public spectrum.

- **47 U.S.C. § 310** places restrictions on the ownership of licenses (*e.g.*, foreign governments, multiple stations in same areas). Section 310 also says that licenses may be transferred only if the FCC finds that the "public interest, convenience, and necessity will be served" thereby. *Id.* § 310(d).

- **47 U.S.C. § 334** (discussed further below), which was adopted in 1992 before the D.C. Circuit's opinions in *Lutheran Church* and

*MD/DC/DE Broadcasters*, precluded the Commission from revising EEO regulations applicable to TV broadcasters.

- **47 U.S.C. § 336** describes the FCC's responsibilities with respect to additional licenses for "advanced television services" that may offer ancillary or supplementary services, which must be provided "consistent with the public interest, convenience, and necessity." *Id.* § 336(a)(2).

- **47 U.S.C. § 339** provides for the carriage of distant television stations by satellite carriers.

- **47 U.S.C. § 403** (discussed further below) allows the FCC to conduct inquiries related to wire or radio communication.

Thus, none of the statutes gives the FCC sweeping authority to take whatever actions or make whatever rules it determines are in the "public interest." Instead, the statutes authorize the agency to take specific actions, *when* those actions are in the public interest. This is the opposite of what the agency claims. The authority to take a host of specific actions suggests the agency lacks authority to take actions which are not listed. Antonin Scalia & Bryan A. Garner, *Reading Law* 107 (2012) (discussing *expressio unius* canon).

Furthermore, contrast these statutes with those through which Congress has authorized EEO considerations, and it is evident how thin a reed the FCC's claim of authority is. In the Cable Act, Congress enacted 47 U.S.C. § 554(d) to expressly require the FCC to collect 395-B-like information from cable companies. This section gives clear rules on what is to be collected and how often. *Id.* Therefore, when Congress wants to grant this authority, it knows how. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") The FCC's interpretation "would rewrite the . . . scheme Congress enacted." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 433 (5th Cir. 2024) (citation omitted). Congress's decision not to impose a similar requirement on broadcasters thus establishes that no such requirement has been authorized.[5]

---

[5] As noted above, and discussed below, Congress directed the FCC not to revise its EEO rules as they apply to TV broadcasters. 47 U.S.C. § 334.

In short, despite the diverse array of powers granted to the FCC by these sections, none authorizes the collection and publication of racial and ethnic (or sex-based) employment data.

### 2. The FCC's authority to conduct "inquiries" does not include the power to require industry-wide reporting and publication

The FCC also relies on 47 U.S.C. § 403, which states that the agency may "institute an inquiry" "in any case and as to any matter or thing concerning which complaint is authorized to be made . . . or concerning which any question may arise under any of the provisions of this chapter [Ch. 5 – Wire or Radio Communication], or relating to the enforcement of any of the provisions of this chapter."

This provision does not give the FCC authority to require and publish Form 395-B. First, a uniform reporting and disclosure requirement is not an "inquiry." Second, inquiries under § 403 must relate to matters under the Act. *See Stahlman v. FCC*, 126 F.2d 124, 128 (D.C. Cir. 1942) (holding that § 403 permits the FCC to "seek through an investigation of its own making information property applicable to the legislative standards set up in the Act"). And since *Lutheran Church* and *MD/DC/DE Broadcasters* struck down the agency's race-based EEO rules, there can

be no possible enforcement-related reason the agency needs this data—as it admits in the rule. Order ¶45, JA__ ("We reaffirm . . . that workforce data collected on Form 395-B will be used only for purposes of analyzing industry trends and reports by the Commission.").

### 3. The FCC's reliance on Section 334 is misplaced

The FCC last relies on 47 U.S.C. § 334, which prohibits the FCC from revising EEO regulations and "the forms used by such licensees and permittees to report pertinent employment data to the Commission" as those requirements apply to television broadcasters. It merely allows the FCC to make "nonsubstantive technical or clerical revisions . . . as necessary to reflect changes in technology, terminology, or Commission organization." *Id.* § 334(c). The FCC's reliance on this section has several flaws.

First, the Commission's revised Form 395-B contains several *substantive* revisions that have nothing to do with "changes in technology, terminology, or Commission organization." 47 U.S.C. § 334(c). As detailed above, the Commission made significant revisions to racial categories, *see* above, pp. 7–8, 10–12, 14–18, and included a category for individuals to identify as more than one race, Order ¶15, JA__. Further, the Commission added a "nonbinary gender" *category*. *See* Order ¶¶39–40,

JA__. The Commission claims that this is a technical or clerical change. *Id.* ¶40, JA__. But one of the commentators cited by the FCC—Foster Garvey Coalition (*see id.* ¶39 n.132, JA__)—sought this new category to provide an option for gender identity that "*extends beyond* the binary options of 'Male' and 'Female.'" *See* Foster Garvey Coal. Comments at 4 (Sept. 30, 2021) (emphasis added).[6] The Commission also added a job category. Order ¶15, JA__. These *categorical* additions are not nonsubstantive, technical changes.

Independently, § 334 expressly refers only to television stations. Nothing in the statute could be said to ratify any regulations with respect to radio, and the FCC's conclusory claim otherwise is purely atextual. Order ¶5, n.19, JA__ (asserting unilaterally and without support that Section 334 ratified the FCC's authority to require Form 395-B for radio stations). Therefore, at the very least, Section 334 does not allow the FCC to impose Form 395-B on radio broadcasters.

Finally, Section 334 was enacted in 1992—before *Lutheran Church* and *MD/DC/DE Broadcasters* held that Form 395-B requirements unconstitutionally pressured broadcasters to make race- and sex-based

---

[6] https://tinyurl.com/34enferr.

employment decisions. The FCC cannot, therefore, prevail by arguing that Section 334 "ratified" its previous EEO mandates. *See United States v. Heinszen & Co.*, 206 U.S. 370, 384 (1907) (Congress only "ha[s] power to ratify the acts which it might have authorized.").

**B.** **The FCC's claim of virtually unlimited power to define, and act upon on its definition of, the "public interest"—beyond its charge to ensure widespread communication services—violates the nondelegation doctrine**

The Constitution vests "[a]ll legislative Powers herein granted" "in a Congress of the United States." U.S. CONST. art. I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Consumers' Research v. FCC*, 109 F.4th 743, 758 (5th Cir. 2024) (en banc) (quoting *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality op.)).

The Supreme Court has held that Congress may "confer[] decisionmaking authority upon agencies" if it sets down an "intelligible principle" to which the agency is "directed to conform." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) (cleaned up). But still, "there are limits of delegation which there is no constitutional authority to transcend." *Consumers' Research*, 109 F.4th at 759. The question is whether a statute "sufficiently instructs" the agency to guide its discretion. *Id.* at 759–60. If an agency's broad reading of a statute implicates

"concerns over separation of powers principles" under the "nondelegation doctrine," a court must read the statute narrowly to avoid such concerns. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 611, 617 (5th Cir. 2021), *aff'd by Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022). It "would frustrate the system of government ordained by the Constitution if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to reach its goals." *Consumers' Research*, 109 F.4th at 758–59 (quoting *Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting).

Here, the Commission points to its "public interest" authority and contends that this authority grants it unlimited power to define the public's interest. As explained in the previous section, none of the Communication Act's "public interest" statutes covers workplace regulation, EEO issues, or race- and sex-based reporting requirements. Even the lone statute that mentions EEO (§ 334) itself is premised on the FCC's unlimited understanding of its "public interest" authority.

Thus, the only way the FCC's action can find support in the Communications Act is if this Court agrees the FCC may itself define the "public interest" in matters beyond the FCC's charge—that is, beyond

communications services. Under that standard, though, no intelligible principle constrains the FCC's authority. It can demand anything from its licensees, as long as it (alone) determines the demand will serve some greater "public interest." This is unconstitutional. *See Consumers' Research*, 109 F.4th at 764 (explaining that "the most important question in the intelligible principle inquiry is whether Congress, and not the Executive Branch, made the policy judgments") (quoting *Gundy*, 588 U.S. at 166 (Gorsuch, J., dissenting)) (cleaned up).

Accordingly, this Court should read the FCC's statutes to limit its authority such that it may regulate in the public interest only if that regulation serves the goal of advancing programming and communication services. In *Lutheran Church*, the D.C. Circuit applied similar principles in rejecting the contention that the FCC could statutorily assert an interest in preventing employment discrimination. Indeed, the court emphasized that "the government's desire to encourage broadcast content that reflected a racial view was at odds with equal protection." 141 F.3d at 355. Thus, the FCC's charge to ensure widespread communications services "to all the people of the United States, without discrimination on

the basis of race, color, religion, national origin, or sex," 47 U.S.C. § 151, precludes the FCC from engaging in race- and sex-based regulations.

Therefore, the Court should hold that Congress's "public interest" delegation to the FCC must (1) relate to administering a "rapid, efficient, Nation-wide, and world-wide wire and radio communication service," 47 U.S.C. § 151, and (2) otherwise fall within the agency's administrative authority to carry out that purpose. The FCC's claim of unlimited discretion to define the "public interest" fails.

Finally, regardless of the above, and at the very least, the Commission has no explicit congressional authority to impose Form 395-B on radio broadcasters. *See* 47 U.S.C. § 334 (precluding FCC from revising 1992 EEO regulations applicable to *television* broadcasters). Therefore, the Court may hold that no statute authorizes the FCC to impose Form 395-B on radio broadcasters and that the nondelegation doctrine precludes the FCC from imposing the form on television broadcasters.

In short, demanding and publishing data on racial and ethnic employment lacks even a tenuous connection to programming or advancing rapid, efficient, nationwide radio service. It bears no connection to programming or the agency's overarching congressional purpose. The agency

simply does not have authority to advance this kind of conception of the "public interest."

## II. The 395-B Form requirement is unconstitutional

Independent of the potential nondelegation concerns, there are two other major constitutional problems with the FCC's decision to require and publish Form 395-B. First, the Order violates the Fifth Amendment's guarantee of equal protection under the law by requiring broadcasters to engage in discrimination on the basis of race. *See Lutheran Church*, 141 F.3d at 354–56. Second, the Order violates the First Amendment's prohibition on compelled speech by forcing broadcasters to guess at the race of their employees and publish those guesses online in a racial scorecard. *See Wooley*, 430 U.S. at 714.

### A. The requirement to file and publish Form 395-B violates equal protection

*Lutheran Church*, 141 F.3d 344, and *MD/DC/DE Broadcasters*, 236 F.3d 13, both held that the FCC's EEO programs unlawfully pressured broadcasters to engage in race-conscious hiring. The FCC claims, however, that those cases did not invalidate the Commission's authority to collect EEO data. Order ¶¶6–9, JA__. The FCC asserts that Form 395-B is a "collection of workforce data from broadcast licensees on Form 395-

B [that] is race- and gender-neutral, and no race- or gender-based gov-

ernment action flows from collection of the data or its public availability."

*Id.* ¶41, JA__. And the FCC assures the public that it will not use Form

395-B data to mandate that broadcasters employ a diverse workforce. *See*

*id.* ¶17, JA__ (promising to "quickly and summarily dismiss any petition,

complaint, or other filing submitted by a third party to the Commission

based on Form 395–B employment data").

The FCC's promises of racial neutrality are empty. First, the rule

*does* require employers to discriminate on race,[7] because it requires them

to classify employees based on the government's racial categories for a

publicly posted racial scorecard. Second, the rule is transparently an at-

tempt to accomplish indirectly what the *Lutheran Church* and

*MD/DC/DE Broadcasters* forbade the agency from accomplishing di-

rectly. *See NRA*, 602 U.S. at 190. As Commissioner Carr said in dissent,

"[t]he record makes clear that the FCC is choosing to publish these score-

card[s] for one and only one reason: to ensure that individual businesses

---

[7] The Order also requires discrimination on the basis of gender, but this
section focuses on racial discrimination. Both violate the Constitution.

are targeted and pressured into making decisions based on race and gender." Order, p. 52, JA__ (Carr, Comm'r, dissenting).

The FCC's claim that the Order does not violate equal protection relies on the Commission's willful blindness and intentional downplaying of its own Order. When the Order's actual consequences are considered, rather than the FCC's empty promises, it must be subject to strict scrutiny. Faced with strict scrutiny, the FCC's rule is doomed—it is neither supported by a compelling interest nor is it narrowly tailored. But because the rule relies on crude categories and rough stereotypes about race, it would fail even rational basis scrutiny.

### 1. The requirement is subject to strict scrutiny because it compels broadcasters to classify individuals by race and post that information online

The Supreme Court has emphasized for decades that the harm of racial classification comes from the classification itself—not only from the use to which the government puts the discriminatory marker. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (identifying the "core purpose" of the Equal Protection Clause as "do[ing] away with all governmentally imposed discrimination based on race"); *Johnson v. California*, 543 U.S. 499, 505

(2005) ("We have insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications."); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995) ("All racial classifications imposed by" the government "must be analyzed by a reviewing court under strict scrutiny."); *Shaw v. Reno*, 509 U.S. 630, 657 (1993) ("Racial classifications of any sort pose the risk of lasting harm to our society. They reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin."); *Washington v. Davis*, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."). "Discrimination" means simply that—drawing distinctions between individuals based on their race. Form 395-B clearly represents government compulsion to draw distinctions or classifications based on race—*i.e.*, to "discriminate." This requires strict scrutiny.

The FCC seems to believe that it can escape strict scrutiny because, since it promises not to make any licensing decisions based on information in the submitted forms, there can be no harm from the mandated discrimination by broadcasters. Order ¶41, JA__ (characterizing the rule

as "race-and-gender neutral" because no race-based government action directly flows from the compelled discrimination). But this misunderstands the reason that race is subject to strict scrutiny in the first place. The purpose of strict scrutiny is to ensure the government has a good reason for *all* racial classifications, because all racial classifications are potentially invidious. They all create divisions, promote racial hostility, and undermine the ideal of a truly racially neutral government. As the Supreme Court famously stated, "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). Racial classifications by the government cause distortions, resentments, and stereotyping—precisely the sort of harms that equal protection exists to prevent. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) ("Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility.").

This Court too has acknowledged that government classification of individuals by race is enough to require strict scrutiny. In *Lewis v.*

*Ascension Par. Sch. Bd.*, 662 F.3d 343, 350 (5th Cir. 2011), the court addressed the constitutionality of school redistricting efforts. The court first made clear that "[a]ll racial classifications imposed by the government must be analyzed by a reviewing court under strict scrutiny." *Id.* at 348. Then, in concluding that there was a genuine question of material fact precluding summary judgment on the question of discriminatory motive, the court observed that the school's "assignment plan," which calculated the percentage of black students, necessarily involved "classifying *individual* students by race." *Id.* at 350. Although the only effect of the classification was to count the proportion of students in certain racial categories, the court recognized that this classification alone created concern—not the classification plus some amorphous disadvantage. The same is true here. Forcing broadcasters to classify their workers by race necessarily involves *classifying by race*. Nothing else is necessary to trigger strict scrutiny.

Even if some hypothetical purely benign government-imposed racial classification system could exist, the FCC's 395-B publication scheme could not be further from that system. In fact, the FCC is unable to hide its desire to strong-arm stations to enhance racial "diversity," even in the

face of the D.C. Circuit decisions in *MD/DC/DE Broadcasters* and *Lutheran Church. See, e.g.*, Order ¶2, JA__ (stating that "workforce diversity is critical to the ability of broadcast stations both to compete with one another and to effectively serve local communities across the country"); *id.* (claiming that collecting this information "is consistent with a broader shift towards greater openness regarding diversity, equity, and inclusion across both corporate America and government"); *id.* at 58–59, JA__ (Statement of Starks, Comm'r, concurring) (describing "urgent need" to collect racial and ethnic classification data because of "how critical it is to have diversity in our media organizations"). Commentators in favor of the Order also repeatedly stated that it was primarily about enhancing diversity, and that it would accomplish this goal by pressuring broadcasters to preference minority hiring.[8]

---

[8] *See, e.g.*, *Leadership Conference on Civil & Human Rights Comment* at 2, MB Docket No. 98-204 (Sept. 29, 2022) ("Mandatory data collection would benefit the government, industry, and civil society. The FCC can use EEO-1 data to advance the commission's Equity Action Plan, and these data would allow the news and communications industry to better understand and target their diversity and inclusion efforts and also allow the public to hold these companies accountable."), https://tinyurl.com/3746z6uy; *MMTC Notice of Ex Parte Communications*, MM Docket No. 98-204, at 29 (Oct. 1, 2002) (discussing how public 395-B forms can be used to pressure and win disparate impact suits against broadcasters),

In the D.C. Circuit decisions referenced throughout this brief, the court recognized the power of informal pressure, third parties, and the FCC's power of "life and death" over licensees, in spite of the agency's protests that its EEO rules did not use quotas or numerical thresholds in the licensing process. In *MD/DC/DE Broadcasters*, the court applied strict scrutiny to the FCC's EEO program simply because one of two recruiting options "put pressure" on broadcasters to direct recruiting resources to women and minorities. 236 F.3d at 19–20. This decision was specifically directed at the agency's data collection, combined with the Commission's history of "raised eyebrow" regulation. *Id.* In the EEO rule struck down, the FCC had given broadcasters a choice of two EEO programs, Option A and Option B. Option A was, essentially, an FCC designed outreach program. *Id.* at 18–19. Option B allowed broadcasters to design their own program but required detailed *reporting* of the race and sex of job applicants. *Id.* at 19. The FCC did not promise enforcement for

---

https://tinyurl.com/mps96ex2; *MMTC Notice of Ex Parte Communications*, MM Docket No. 98-204, at 2 (Mar. 3, 2022) ("[C]ertainly Form 395 data should be made public (unless shielded by a protective order) so the [FCC] may determine whether a violator of the broad outreach rules has also done inherently discriminatory 'word of mouth recruitment' through the 'mouths' of a homogeneous staff."), https://tinyurl.com/mpckwdv4.

not hitting specific numbers or threaten broadcasters if they failed to reach a quota. It claimed only that it would investigate where the data revealed "few or no" minority applicants. *Id.* But the D.C. Circuit nonetheless recognized that simply by requiring this reporting, the FCC violated equal protection, and largely because of the informal pressure the agency could—and often did—apply. *Id.* at 20–21. The court cited to informal actions like "request[s] for a formal response . . . the prominent speech or statement by a Commissioner or Executive official, [or] the issuance of notices of inquiry." *Id.* at 19. Combined with rigorous data collection, threat of even informal actions could create an equal protection problem. *See also Lutheran Church*, 141 F.3d at 354 ("[W]e do not think it matters whether a government hiring program imposes hard quotas, soft quotas, or goals. Any one of these techniques . . . can and surely will result in individuals being granted a preference because of their race.").

The D.C. Circuit also recognized the important role third parties play in this informal pressure process. In *Lutheran Church* itself, the FCC's license review was supported by an NAACP petition seeking to deny the church's license renewal on the ground that the church failed to have sufficient racial parity among its workforce. 141 F.3d at 346; *see id.*

at 353 ("'Underrepresentation' is often the impetus (as it was in this case) for the filing of a petition to deny, which in turn triggers intense EEO review.") (citation omitted). It simply is not true that the agency's public posting of racial scorecards can be spared constitutional scrutiny because of a formal (promised) disconnect between those scorecards and the agency's EEO enforcement.

An agency cannot escape strict scrutiny for a mandatory racial classification scheme by ensuring the regulation does not incorporate an express sanction for falling below certain parity thresholds. Neither program struck down by the D.C. Circuit expressly incorporated racial parity thresholds. *See MD/DC/DE Broadcasters*, 256 F.3d at 328–29 (discussing option in EEO rule scrutinizing licensees on basis of racial and ethnic makeup of job applications); *Lutheran Church*, 141 F.3d at 352–54 (discussing incentives in EEO rule to pursue race-conscious hiring). The FCC's argument is essentially that by being less explicit about their "raised eyebrows," *MD/DC/DE Broadcasters*, 256 F.3d at 328, it can pretend that its program—which involves explicit racial classifications—is "race neutral." But an agency cannot escape strict scrutiny by hiding the ball.

## 2. The Order would fail any level of scrutiny, and certainly fails strict scrutiny

To satisfy strict scrutiny, the FCC must demonstrate that its use of racial classifications is "narrowly tailored" to achieve a "compelling" government interest. *Parents Involved in Cmty. Schs.*, 551 U.S. at 720. The FCC fails both prongs, failing to identify any interest within its statutory ambit and failing to demonstrate that it needs to use racial classifications and public publication to accomplish even its stated goals. But even under a less "searching" standard, the FCC's classifications would fail because they rely on "incoherent" and ever-changing groupings derived from historical contingency. *See Students for Fair Admissions, Inc.*, 600 U.S. at 293 (Gorsuch, J., concurring).

First, the regulation is not supported by a compelling interest, or any interest, within the FCC's statutory authority. The Supreme Court recently confirmed that only two compelling interests permit resort to race-based classifications. "One is remediating specific, identified instances of past discrimination," and the other is "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Students for Fair Admissions, Inc.*, 600 U.S. at 207. The FCC does not claim either interest is at stake. Instead, the FCC cites several other interests,

including "preparing meaningful and accurate analyses of workforce trends in the broadcast industry;" "conduct[ing] analyses of trends across different communications sectors;" making reports for Congress; and promoting "greater openness regarding diversity, equity, and inclusion" in the broadcasting industry. Order ¶¶2, 15, 35, JA__. And, of course, the FCC notes its interest in the "critical" goal of "workforce diversity." *See, e.g.*, *id.* ¶2, JA__.

None of the interests cited by the FCC support the classification and publication requirements here. First, for the reasons explained above, EEO and demographic reporting objectives are outside of the FCC's authority. "[T]he FCC is not the Equal Employment Opportunity Commission." *Lutheran Church*, 141 F.3d at 354. The FCC has no statutory mandate to "prepar[e] meaningful . . . analyses of workforce trends" with respect to demographic statistics. Order ¶2, JA__. Nor has Congress requested any reports from the agency. And where those analyses have been mandated by Congress, as with EEOC reporting, there are strict statutory confidentiality requirements, and limitations on who has to file. 42 U.S.C. § 2000e-8(e). The FCC's decision to exceed Congress's demands in both respects by choosing to make the data public and cover a much

larger group of enterprises, demonstrates that the Commission's claimed objectives are disingenuous.

Second, even if the FCC could assert some kind of interest in collecting demographic data, this interest is insufficiently important to justify racial classifications and burdensome reports. Since the FCC has completely disclaimed any ability to take any actions with respect to the information in the reports, it seems impossible for the FCC to claim that it has a meaningful interest tied to its licensing authority. Agencies simply do not have a free-floating interest in imposing obligations on their regulated entities just in case Congress might later be interested, but even if they did, surely this contingent interest is of minor significance. Such an interest cannot possibly be considered "compelling" and cannot justify forcing businesses to classify (and publish) their employees based on racial and ethnic categories.

Third, even if there was some interest for collecting this information, there is no justification to publish the racial scorecards on the FCC's website. As explained above, online publication undoubtedly imposes a significant pressure to engage in affirmative action. And it is completely unnecessary to the FCC's stated aim. The FCC states, without

support, that online publication will improve the "accuracy" of the data. Order ¶15, JA__. However, this assertion is based on the idea that third parties will check the data posted and bring claims against broadcasters for filing incorrect data. *Id.* But the FCC nowhere explains why third parties would do this, or could do this, especially since the FCC has promised to "promptly dismiss" EEO claims brought on the basis of 395-B data. *See id.* ¶¶17–18, JA__. As Dissenting Commissioner Carr explains, in summarizing the lack of evidence for the idea that reporting would enhance accuracy, "[a]fter all, how exactly does the FCC anticipate that a member of the public will verify the reported race, ethnicity, and gender of an individual employee—including those that the FCC now says can report as gender non-binary? It doesn't." Order at 55, JA__ (Carr, Comm'r, Dissenting). The FCC's other arguments—that publication is consistent with some unspecified congressional goal of maximizing data utility, and that publication avoids the problem of "accidentally" disclosing data—are both thin and totally circular, as Commissioner Carr also points out. *Id.* ¶15, JA__; *id.* at 55, JA__ (Carr, Comm'r, dissenting).

The FCC gives no good reason for this regulation, because there is none—the purposes are all plainly pretextual. *Id.* (Carr, Comm'r,

dissenting). The agency's true purpose is to pressure broadcasters to use race balancing hiring policies. But admitting this purpose directly would reveal that the Order has and is intended to have impacts on broadcaster hiring. The Commission has to be circumspect. This Court should not play along.

The regulation fares no better with respect to tailoring than it did on governmental interest. For one, it is unclear why the FCC is using racial classifications at all, or why it is using the classification scheme it has adopted. The FCC simply asserts it needs racial data to make reports but can give no explanation why or clarify what reports or what the purpose of the reports would be. This is especially troubling in light of the Supreme Court's admonition in *Students for Fair Admissions* that these racial categories are essentially arbitrary and perpetuate stereotypes. 600 U.S. at 216–17 (discussing how categorizing individuals into "incoherent" racial categories furthers "irrational stereotypes").

Furthermore, Form 395-B is far more intrusive than necessary for its ostensible goals. The FCC already collects enormous amounts of information about each broadcaster as part of the ordinary licensing process. To the extent that Congress needs to be (more) informed about demo-

graphic trends in this industry, the EEOC already collects this data and publishes detailed reports, including data broken down into the "broadcasting" sector.[9] The EEOC also manages to provide this data without publishing the information publicly for each employer.

Even if the FCC was right that it needed more nuanced and detailed information about this sector, directly from the licensees, it had many alternatives. It could obtain this information and hold it confidential, or disclose it only in an aggregated form, as the EEOC does, or in anonymized form. Any of these options would meet the FCC's goals, without imposing a burdensome, race-based classification system on the industry.

### B. The requirement to file and publish Form 395-B violates the First Amendment prohibition on compelled speech

The Supreme Court has explained that "freedom of speech" necessarily encompasses "both what to say and what not to say." *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). Compelled speech, with certain narrow exceptions, must pass strict scrutiny. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 768–69

---

[9] *See EEO-1 (Employer Information Report) Statistics*, https://tinyurl.com/fdr7hhjz.

(2018). The FCC's compelled disclosure and publication of racial score-

cards is compelled speech. As Commissioner Carr stated in dissent, "[b]y

requiring stations to publicly disclose their workforce composition, the

Order compels speech on matters of race and gender." Order at 56–57,

JA__ (Carr, Comm'r, dissenting).

The FCC asserts that there is no compelled speech concern raised

by the forced publication of Form 395-B for two main reasons. First, the

Commission argues that the requirement cannot be compelled speech,

because the Order requires only "reporting of factual information to the

Commission." Order ¶51, JA__. Second, the Commission argues that,

even if it is compelled speech, it should be judged under a more forgiving

standard than strict scrutiny. Neither argument has merit.

First, it is legally irrelevant whether the disclosures are factual.

The Court has repeatedly struck down compelled disclosures even when

those disclosures are purely compelled statements of "fact." *See, e.g.*, *NI-

FLA*, 585 U.S. at 776 (striking down requirement for pregnancy centers

to provide certain factual information to pregnant women); *Riley*, 487

U.S. at 800–01 (striking down requirement that fundraisers disclose cer-

tain information to donors); *see also Rumsfeld v. F. for Acad. & Institu-*

*tional Rts., Inc. (FAIR)*, 547 U.S. 47, 62 (2006) ("[C]ompelled statements of fact . . . like compelled statements of opinion, are subject to First Amendment scrutiny.").

The FCC is simply wrong that compelled speech principles do not apply to "reporting of factual information." In *FAIR*, the Court held that the government could require schools to report military-recruiter scheduling information to students, not because the scheduling information was factual, but because students would be able to appreciate that this was not speech *by the school. See id.* at 65 (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980)). But here, there is no way that anyone could mistake the source of the speech—*employers* are the ones who are forced to classify, and *employers* are the ones who are forced to file the publicly posted report. Contrary to the FCC's assertion, the Commission simply is not "collect[ing] the data" and publishing it themselves. Order ¶51 n.166, JA__ (quoting *Riley*, 487 U.S. 781). Rather, the agency is compelling its licensees to do it. This makes all the difference.

Furthermore, it isn't even true that these disclosures are purely factual and devoid of content. There is a world of difference between "the U.S. Army recruiter will meet interested students in Room 123 at

11 a.m." and the "my visual survey tells me that Bill Smith, my station manager, who refused to self-identify, is a black man." This is arguably not even a statement of fact—it's pure opinion, especially for the millions of mixed-race Americans in the country. And the compelled judgments and disclosures only get more awkward from there. Form 395-B not only requires employers to use "observer identification" to identify their workers' races when those workers refuse to self-identify, *see* above pp. 7–8, 10–12, 14–18, but it also requires them to identify their workers' genders, up to and including identifying them as "non-binary." The constant revisions by the FCC (and EEOC and OMB) show that categories of "races" and "ethnicities" are not simple matters of fact that can be easily and uncontroversially collected. *See also* David E. Bernstein, *The Modern American Law of Race*, 94 S. Cal. L. Rev. 171, 231–34 (2021) (discussing FCC's racial categories and disputes involving, *e.g.*, whether Adolfo Liberman, born in Poland but claiming Spanish Jewish ancestry, qualified for a tax credit even though he lacked a Spanish surname, one of the FCC's "minority" categories at the time). In the context of a worker who has refused to self-identify, an employer that is required to visually inspect and report a judgment on that worker's race and gender is being

compelled to participate in a government classification scheme that he may not agree with. Furthermore, this requirement applies to licensees with as few as five employees, meaning there is no way for the FCC to pretend that the racial and gender judgments will not be on display, and will not be attributable to actual people running and working for these broadcasters. It simply does not compare to the situation in *FAIR*.

The FCC next argues that, even if the First Amendment applies to its disclosures, it should be judged under a reduced scrutiny as in *Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985). This argument is meritless. There is no connection to commercial advertising or even the sale of a good or service by a regulated party. This puts Form 395-B disclosures outside the scope of *Zauderer*. *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014) ("Of course to match *Zauderer* logically, the disclosure mandated must relate to the good or service offered by the regulated party."); *see also R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1213 (D.C. Cir. 2012) (holding *Zauderer* exception is "limited to cases in which disclosure requirements are reasonably related to the [government's] interest in preventing deception of consumers"). In *NIFLA* itself, the Court explained that

*Zauderer* applies only to "purely factual and uncontroversial information *about the terms under which services will be available.*" 585 U.S. at 768 (emphasis added) (cleaned up). But even if *Zauderer* applied, the disclosure of racial categories for unwilling employees is the opposite of "uncontroversial." *See id.* (observing that the abortion topic is anything but "uncontroversial").

Through the Form 395-B requirement, the FCC compels speech on matters of race and gender, a compulsion that should be subjected to heightened First Amendment scrutiny. theDove would much rather not have to disclose its best guess on the race and gender of each member of its workforce, and theDove also disagrees with the government's policy of classifying employees into artificial racial buckets. This is protected speech. *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 508–09 (6th Cir. 2021) (observing that "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern" in concluding that professor who refused to use a student's chosen pronouns "took a side in the debate").

And once subjected to strict scrutiny, it is obvious that the Order cannot survive. For the reasons explained above, the FCC cannot assert

anything like a compelling interest in either collecting or forcing broadcasters to disclose this information. And given the many alternatives available to the agency, such as holding the forms confidential, relying on EEO reporting, or using non-raced based measures, the Order is not narrowly tailored.

## CONCLUSION

This Court should enjoin and set aside the Order.

Respectfully submitted,

/s/ *Oliver J. Dunford*
OLIVER J. DUNFORD
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: (916) 503-9060
ODunford@pacificlegal.org

WILSON C. FREEMAN
Pacific Legal Foundation
3241 E. Shea Blvd., # 108
Phoenix, AZ 85028
Telephone: (716) 352-3541
WFreeman@pacificlegal.org

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Oliver J. Dunford*
OLIVER J. DUNFORD
*Counsel for Petitioner*

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.    This document complies with Federal Rule of Appellate Procedure 27(d)(2)(a) because this brief contains 12,122 words, excluding items enumerated in Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2. I relied on my word processor, Microsoft Word, to obtain the count.

2.    This document complies with Federal Rule of Appellate Procedure 32(a)(5)–(6). It is printed in 14-point Century Schoolbook, a proportionately spaced font.

/s/ Oliver J. Dunford
OLIVER J. DUNFORD
Counsel for Petitioner